# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**25-399**

## SUCCESSION OF

## JAMES VERNON GOUDEAU

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. P-20211003
HONORABLE MICHELE S. BILLEAUD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Candyce G. Perret, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**Charles M. Rush**
**Rush, Rush & Calogero**
**202 Magnate Drive**
**Lafayette, LA 70508**
**(337) 235-2425**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Sharon Schmidt**

**Jena Marie Kyle**
**Allen & Gooch, A Law Corporation**
**P.O. Box 81129**
**Lafayette, LA 70598-1129**
**(337) 291-1690**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Angela Clare Goudeau, Independent Executor**
    **of the Succession of James Vernon Goudeau**

**Harold Lee Domingue Jr.**
**Onebane Law Firm**
**P. O. Box 3507**
**Lafayette, LA 70502**
**(337) 237-2660**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Angela Clare Goudeau, Independent Executor**
    **Succession of James Vernon Goudeau**

**KYZAR, Judge.**

Plaintiff, Sharon Schmidt, appeals from the trial court judgment finding she failed to prove that she was the forced heir of her father pursuant to La.Civ.Code art. 1493, and thus, was not entitled to any portion of her father's estate. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Plaintiff is one of six children born to the decedent, Vernon James Goudeau, during his marriage to his ex-wife, Louwellyn Pitre.[1] Mr. Goudeau died testate on November 7, 2021. In his last will and testament, dated July 27, 2007, Mr. Goudeau made one bequest of property to his long-term companion, Beulah McGee, with the residuary of his estate being left to his daughter, Angela Clare Goudeau (Defendant).[2] Mr. Goudeau also named Defendant as the executor of his succession.

On December 21, 2021, Defendant filed a petition seeking to probate Mr. Goudeau's will and to be appointed the independent executor of his estate. As the will was in notarial form, the trial court ordered that it be executed and confirmed Defendant as the independent executor of Mr. Goudeau's succession. Thereafter, Defendant and Ms. McGee filed a petition for partial possession, seeking to have Ms. McGee recognized as a particular legatee under the will and to send her into possession of the bequest left to her. A judgment of partial possession was rendered in Ms. McGee's favor by the trial court on January 21, 2022. The judgment further

---

[1] The six children, listed from oldest to youngest, are Eileen Ann, Sharon Gail, Carolyn Elaine, Brett James, Angela Clare, and John Neil. At the time his death, Mr. Goudeau had been predeceased by Carolyn Elaine and Brett James, who were each survived by two children. Although Carolyn's name is spelled as "Caroline" in the trial transcript, her name is spelled as "Carolyn" in this opinion.

[2] Although the testament spells Angela's middle name as "Claire," she spells it "Clare."

noted that the remaining assets of the succession continued to be under Defendant's administration.

On December 22, 2022, Plaintiff filed a Petition for Reduction of Excess Legacy, alleging that as a descendant of the first degree, she was a forced heir under La.Civ.Code art. 1493 because her mental incapacity and physical infirmity at the time of her father's death rendered her permanently incapable of taking care of her person and administering her estate (hereafter referred to as "permanently incapable"). She further alleged:

> Since, at the time of death of the decedent, Petitioner, Sharon Schmidt had, according to medical documents, an inherited, incurable disease or condition that renders her incapable of caring for herself and administering her estate, she is defined by law as a forced heir whose legitime, according to article 1503 of the Louisiana Civil Code, is reducible to the extent necessary to eliminate the impingement on the legitime.

Accordingly, Plaintiff alleged that the legacies in her father's will were excessive and should be reduced to 5/6th of his estate, with the remaining 1/6th being granted to her pursuant to La.Civ.Code art. 1495.1.

Defendant, as executor, answered Plaintiff's petition on January 25, 2023, denying that Plaintiff qualified as a forced heir and raising two affirmative defenses. First, she asserted that Plaintiff was neither mentally nor physically permanently incapable at the time of their father's death. Second, she asserted that Plaintiff "did not have, according to medical documentation, an inherited, incurable disease or condition that may render her incapable of [caring] for her person or administering her estate in the future."

The matter proceeded to a trial on the merits on January 28–29, 2025. At the close of the trial, the trial court rendered oral reasons for judgment, finding that Plaintiff failed to prove that she was a forced heir under either La.Civ.Code art.

2

1493(A) or (E). A written judgment was rendered for the reasons assigned in the trial court's oral reasons on February 17, 2025. It is from this judgment that Plaintiff appeals.

Plaintiff raises two assignments of error on appeal:

1.   The trial court erred in its application of the law and jurisprudence in finding that Sharon did not meet her burden of proof under La.Civ.Code art. 1493(A) that she had a mental incapacity or physical incapacity that rendered her permanently incapable of taking care of her person or administering her estate as of November 7, 2021.

2.   The trial court erred in finding that Sharon did not meet her burden of proof under La.Civ.Code art. 1493(E), that, as of November 7, 2021, she had, according to medical documentation of an inherited, incurable disease or condition that may render her incapable of caring for her person or administering her estate in the future.

**OPINION**

On appellate review, "[a] trial court's consideration of the factual circumstances surrounding the circumstances and severity of a potential forced heir's capacity to care for herself or administer her estate is subject to the manifest error/clearly wrong standard of review." *In re Succession of Forman*, 09-1455, p. 2 (La.App. 3 Cir. 5/5/10), 37 So.3d 1081, 1083, *writ denied*, 10-1100 (La. 9/3/10), 44 So.3d 684. In *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989), the supreme court discussed the manifest error-clearly wrong standard in detail, stating:

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978); *Canter v. Koehring*, 283 So.2d 716, 724 (La.1973)[.] . . . [I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence

3

differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Arceneaux, supra* at 1333, *Watson v. State Farm Fire & Casualty Ins. Co.*, 469 So.2d 967 (La.1985)[.] . . .

When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Canter, supra* at 724[.]

The same holds true for expert witness testimony, as the supreme court, in

*Hanks v. Entergy Corp.*, 06-477, pp. 23–24 (La. 12/18/06), 944 So.2d 564, 580–81

(citations omitted), stated:

[T]he rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error.

"A legal error occurs when a trial court applies incorrect principles of law,

and such errors are prejudicial." *Irwin v. Brent*, 24-1043, p. 3 (La. 6/27/25), 413

So.3d 342, 345 (per curiam). A legal error is prejudicial if it "materially affect[s] the

outcome of the trial and deprive[s] a party of substantial rights[.]" *Id.* In such cases,

if the record is complete, the appellate court will perform a de novo review and

render judgment on the record. *Id.*

Louisiana Civil Code Article 1493 (emphasis added) defines a forced heir, in

part, as follows:

A. Forced heirs are descendants of the first degree who, at the time of the death of the decedent, are twenty-three years of age or younger or descendants of the first degree of any age who, *because of mental incapacity or physical infirmity, are permanently incapable of taking care of their persons or administering their estates* at the time of the death of the decedent.

. . . .

4

E. For purposes of this Article "permanently incapable of taking care of their persons or administering their estates at the time of the death of the decedent" shall include descendants who, at the time of death of the decedent, have, according to medical documentation, an inherited, incurable disease or condition that may render them incapable of caring for their persons or administering their estates in the future.

The language highlighted above is based on La.Const. art. 12, § 5(B), as amended in 1996, which provides one and possibly two classes of forced heirs. First, "descendants, of the first degree, twenty-three years of age or younger" were required to be classified as forced heirs. *Id.* Second, the legislature was granted the discretion to classify "descendants of any age who, because of mental incapacity or physical infirmity, are incapable of taking care of their persons or administering their estates[]" as forced heirs.[3] *Id.*

According to Paragraph (c) of the 1996 Revision Comments of La.Civ.Code art. 1493, the language pertaining to this second class of forced heirs was based on terminology found in La.Civ.Code art. 389.1 relative to limited interdictions. Until the revision of the interdiction law pursuant to 2000 La. Acts, 1st Ex.Sess. No. 25, § 1, effective July 1, 2001, a person who was incapable "of caring for his own person or of administering his estate[]" due to "mental retardation, mental disability, or other infirmity[,]" was subject to limited interdiction pursuant to La.Civ.Code art. 389.1. Thus, Paragraph (c) pointed out that "[t]he drafters of Act 147 of 1990 contemplated that" courts would look to the interdiction jurisprudence when "interpreting and enforcing the incapacity or infirmity provisions" in Article 1493. However, it emphasized that Article 1493 was "intentionally different and more

---

[3] This language was first found in Article 1493, as it was renamed and amended pursuant to 1990 La. Acts No. 147, § 1, effective July 1, 1990. However, the supreme court declared it unconstitutional based on the former provision in La.Const. art. 12, § 5, which at the time provided that "[n]o law shall abolish forced heirship." *See Succession of Lauga,* 624 So.2d 1156 (La.1993).

5

restrictive than the standard for interdiction because" the infirmity or incapacity under Article 1493 is permanent.

Louisiana Civil Code Article 390 (emphasis added), which replaced Article 389.1, provides:

> A court may order the limited interdiction of a natural person of the age of majority, or an emancipated minor, *who due to an infirmity is unable consistently to make reasoned decisions regarding the care of his person or property, or any aspect of either, or to communicate those decisions,* and whose interests cannot be protected by less restrictive means.

Although the terminology was revised to remove the archaic reference to "mental retardation," we find that Article 390 still aligns with the protective purpose underlying the prior limited-interdiction scheme by supplying "autonomy where it [is] lacking by nature and shield[ing] it where it exist[s], through the mechanism of the grounds." Jeanne Louise Carriere, *Reconstructing the Grounds for Interdiction*, 54 La. L. Rev. 1199, 1208 (1994). Applying this protective purpose to the elements of Article 389.1 and La.Civ.Code art. 422,[4] Professor Carriere found that the "infirmities" necessitating interdiction "should be confined to those that cripple the infirm person's decision-making powers—his intellect and will—with regard to his person and his property." *Id.* at 1223. Based on the jurisprudence, she found that "[b]ecause the issue is the decision-making capacity of the proposed interdict," the determination that a person is unable to care for his person "tests for more that [sic] than just the physical ability of the interdict to feed, clothe, and bathe himself, and maintain hygienic living quarters[,]" and that "mere physical incapacity is

---

[4] Article 422, which was also vacated by 2000 La. Acts, 1st Ex.Sess. No. 25, § 1, provided, in part, that "[n]ot only lunatics and idiots are liable to be interdicted, but likewise all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates."

6

insufficient" to prove the incapacity of a person to administer his estate. *Id.* at 1228, 1230. Rather, she stated, "[t]he functional test in Article 422 and 389.1 has become in the jurisprudence 'mentally incapable of administering his estate.'" *Id.* at 1230. Accordingly, the determining factor under Article 1493(A) is whether Plaintiff's mental incapacity or physical infirmities have rendered her incapable of making reasoned decisions regarding the care of her person or the administration of her estate.

### *Lay Testimony*

The trial court heard testimony from Plaintiff, Val MacGyvers, Eileen Goudeau, and Defendant. The expert testimony will be reviewed under the assignments of error.

According to Plaintiff, she was permanently incapable as of November 7, 2021, due to neck and back issues she suffered in a 1975 car accident and other medical issues. During the accident, she broke the car's steering wheel with her chest, and she lost consciousness after hitting the windshield with her head. Her medical records establish that she complained of neck pain on June 26, 2014, radiating pain and weakness in her shoulders on May 12, 2015, and numbness, tingling, and weakness in her upper extremities on September 15, 2016. On December 1, 2021, just after her father's death, she complained of increased neck and back pain over the previous three to four months. Cervical x-rays revealed a loss of curvature in her cervical spine.

This was Plaintiff's first complaint of back pain in her medical records other than to relate that she had a history of back pain. However, she claimed that she experienced back pain prior to 2014, the date of the earliest medical record admitted into evidence, that she had sought emergency treatment for back pain about six times

7

during the prior ten years, and that she has many herniated discs. Plaintiff rated her neck pain on May 12, 2015, as five on a good day and ten on her worst day. While she rated her pain the same as of November 7, 2021, she claimed that the frequency of her pain had increased and that she could not remember the last time she was pain-free.

Plaintiff admitted that she has not sought treatment for her neck and back issues other than to take pain medication and muscle relaxers. She said, "I don't want to be touched, I don't want to be probed, I definitely will never allow myself to be cut on. I've had a heart attack, I'm at high risk for surgery. Anesthesia, I'm not doing that." She also has not done physical therapy despite multiple recommendations because "[i]t's beyond my capabilities right now and probably forever."

Plaintiff testified that she was found disabled by the Social Security Administration (SSA) as of December 2017, and her student loans were forgiven by the U.S. Department of Education (USDE) based on that disability determination. Plaintiff believed that her physical limitations had worsened since 2017. She explained that although the SSA's physician determined that with normal breaks, she could sit for six hours, she denied that she could still do this as of November 7, 2021, because while she can drive for five to six hours, she has to stop at least three times for breaks.

Plaintiff's other medical conditions as of November 7, 2021, were supraventricular tachycardia (SVT), headaches, carpal tunnel syndrome, scoliosis, and Sturge-Weber syndrome. Plaintiff was diagnosed with SVT in 1972, which causes her heartbeat to increase, sometimes up to 240–260 beats per minute, her blood pressure to plummet, and is treated by stopping and restarting her heart.

8

Although her SVT was controlled by medication, Plaintiff said that she began experiencing breakthrough episodes in 2017, which she related to stress.

Plaintiff, who said that she has experienced headaches her whole life, related her headaches to the misalignment of her lower jaw with her upper jaw. She described all of her headaches since 2017, as "pretty bad[,]" and she estimated that they occur five to seven times a week. Plaintiff claimed that her carpal tunnel syndrome, which was diagnosed in 2019, affected her when she was in college between 2001 to 2010, but now, it causes two of her fingers to pull in and lock when she uses a mouse. Plaintiff said that she was diagnosed with scoliosis in 2018. When asked how it affects her, she stated that it affects her when combined with her other spinal issues. She admitted that while she experiences no physical restrictions from her Sturge-Weber syndrome, it affects her psychologically and emotionally by preventing her from doing things.

Plaintiff testified that as of November 7, 2021, she was also diagnosed with depression and anxiety, which she claimed were inherited. She related these conditions to the physical and emotional abuse she suffered during her childhood at the hands of her mother. This included her mother telling her that she hated her because after her birth, her father left the hospital for three days when he saw her birthmark; her mother blaming her for the failure of her marriage; and her mother forcing her father to kick her out of the house when she was a teenager. Plaintiff claimed that she had a confirmed diagnosis for anxiety possibly earlier than but definitely as of March 7, 2016, and while she claimed that she was also diagnosed with depression and post-traumatic stress disorder (PTSD), she did not recall when those diagnoses occurred.

9

According to Plaintiff, the underlying reason for her anxiety has changed over time. In October 2023, when she began seeing Dr. Andrew Aubin, a psychiatrist, it was related to her "horrific memories from [her] childhood[;]" her father telling her that he was "scared of dying[;]" Defendant telling her that their father did not leave a will; her later finding out that he left a will but that she was excluded from it; and her belief that the exclusion confirmed that she did not matter to her family. In her December 13, 2024 deposition, her birthmark was the primary reason for her anxiety. During her testimony, her anxiety was related to social interactions with the public, as a result of which she estimated that she isolated herself ninety-nine percent of the time due to feeling threatened by public reaction to her birthmark and that she only left her house once a week.

Other than taking Xanax and hydroxyzine pamoate, Plaintiff has sought no treatment, nor has she undergone any therapy for depression or anxiety. Neither has she ever been hospitalized nor been suicidal due to these conditions. Although she claimed that her Xanax prescription resulted from the "panic attacks, anxiety attacks, [and] difficulty breathing" she experienced "pretty much right after daddy's death[,]" she later stated that she began taking Xanax in 2019, following her heart attack. Plaintiff also said that she has not undergone therapy because "I don't want to." In referring to her college studies,[5] she opined that it would not be beneficial "because I know how therapy works from the inside and I don't have a lot of faith in it." Plaintiff also admitted that she answered "no" to any screening questions regarding depression, anxiety, or smoking, because she felt the questions were an invasion of her privacy.

---

[5] Plaintiff's undergraduate degree was in behavioral studies. Although she did not complete her master's degree, her coursework for that degree focused on psychology and counseling.

Regarding her family history of depression and anxiety, Plaintiff claimed that her mother suffered nervous breakdowns; that neither her mother nor Eileen would or will cross bridges due to anxiety; that Eileen missed her daughter's wedding shower due to anxiety; and that one of her brothers has a facial tic and becomes very anxious. Regarding her extended family, Plaintiff stated that her maternal grandmother was high strung; that an aunt would not leave her house; and that she was told by Eileen that their aunt passed out once when she was left alone in a store. However, she did not know if her mother or father were ever diagnosed with depression or anxiety.

Plaintiff lives either with her former college professor, Val MacGyvers, or another friend, Stan, with whom she reconnected in 2013. She began living full-time with Ms. MacGyvers in 2017, and she also stays with Stan periodically at his current home in Texas. She also visited him at his former home in Chicago where she would either drive three days, one way, or fly there. When visiting Stan in Texas, she drives six hours each way, with stops every two hours. Plaintiff also stayed with him multiple times when he had surgery because he needed someone to care for him, to drive him to medical appointments, and to help with his dog. In 2015, she stayed with her daughter in Seattle and Texas for about six months while she underwent surgery and medical treatment for epilepsy.

Plaintiff testified that she also has three close friends from college whom she sees and communicates with periodically. She has a close relationship with her daughter, whom she talks to nearly every day and communicates with via Facebook messenger. She has visited her daughter in Glacier, Montana, and she drove three days, each-way, to see her in Colorado approximately four months prior to trial. She also has a close relationship with her son, whom she talks to about three times a

11

week by phone or Facebook messenger. She drove three days, each-way, to see him in Knoxville, Tennessee about eighteen months prior to trial.

Plaintiff admitted that she has never given her power of attorney to anyone, never thinking it was necessary to do so. She stated that she represented her father at an eviction proceeding on December 3, 2020, and after his death, she conducted a record search of his name at the courthouse while searching for his will.

As of November 7, 2021, Plaintiff stated that she was unable to cook, lift pots, place heavy items in the oven, take walks, do yardwork, do housework, make her bed, remove the sheets from her bed, carry groceries, or sit on soft chairs or couches. With accommodations, she could shower by herself. She could also dress herself, drive herself, heat up microwavable meals, and use a roller bag for groceries. She stated that she sometimes used a cane for assistance, she could pick up light things from the floor with a "grabber," she could pull small items from the washing machine with a pair of tongs, and with Ms. MacGyver's and Stan's assistance, she grew plants.

At the time of trial, Plaintiff could shower by herself, brush her teeth, wash, dry, and trim her hair, and dress herself. She mostly finger-combed her hair because brushing required her to raise her arms above her head. She uses a cane when walking further than five or ten feet, and she holds onto a chest when getting out of bed, onto the counter when brushing her teeth, and onto the wall when walking from her bedroom to the kitchen. She feeds herself, cooks pre-made microwavable meals, makes sandwiches and tuna fish salad, goes to Walmart or Dollar General, and carries light groceries into the house from her car. Plaintiff only changes her clothes once a week, and Ms. MacGyvers usually washes her clothes as she is often unable

12

to wash them. When staying with Stan, she cleans her toilet with a cleaning gel without using a brush.

Plaintiff admitted that she schedules her own medical appointments, drives herself to her appointments, communicates with her attorneys, pays her bills, manages her money, and reads books on her Kindle. On her computer, she reads and sends emails, checks the news, collects recipes, reads blogs, participates in groups, shops online, visits the online platform Substack, performs simple photo editing, plays word games, and watches videos. Although she has a flip phone, she rarely sends text messages. She has a handicap hang tag for her car, and she leans on shopping carts when shopping.

At the time of trial, Plaintiff had approximately 100 plants. She admitted that in the past, she has had up to 300 plants. Depending on how she is feeling, Plaintiff cares for her own plants, watering and fertilizing them. Her plants in Texas are cared for by Stan when she is in Lafayette and when she feels unwell while visiting him.

Ms. MacGyvers stated that Plaintiff, her former psychology student, began living with her permanently in 2017. She said that as of November 7, 2021, Plaintiff occasionally cooked, took out the trash, carried small items to and from her car, scrubbed the sink, did her own laundry, surfed the internet, shopped online, picked up her purchases, prepared her own meals, either microwavable or take-out, fed herself, scheduled and drove to her medical appointments, picked up her medication, and paid her own bills. She estimated that Plaintiff drove to Texas five times a year to stay with Stan because he had no other friends. She also stayed with him every time he had surgery. She estimated that Plaintiff left the house a couple of times a week for medical appointments or to pick up medication, went to Goodwill once or twice a year, and occasionally went to visit friends. Plaintiff, with her assistance,

13

repotted, watered, and propagated Begonias from cuttings. Ms. MacGyvers said that she helped by lifting and moving plants, filling a container with potting-soil components, and watering the plants when Plaintiff was away from home.

Ms. MacGyvers stated that as of November 7, 2021, Plaintiff only sat on straight, hardbacked chairs, usually with her arms on the table to support her upper body. Plaintiff's bathroom, outfitted previously for Ms. MacGyver's mother, has a walk-in shower with grab bars, a bench, and a handheld shower tool. She stated that Plaintiff could bathe and dress herself, and while she might hold onto something when stepping over something on the floor, it was only recently that she had begun using a cane or accepting help to load her car for trips. Ms. MacGyvers stated that she did most of the housework, washed and dried bedding, remade the beds, occasionally ran errands, or picked up medication or food for Plaintiff, and drove Plaintiff to any medical appointment involving sedation. She did not think that Plaintiff's issue of isolating herself had worsened since November 7, 2021.

Neither Eileen Goudeau nor Defendant had any personal knowledge regarding whether Plaintiff was permanently incapable as of November 7, 2021. Both had only seen Plaintiff about three times between 2015 and 2021 or 2022. Eileen, who saw Plaintiff after their mother died in January 2022, noted that she was able to walk without difficulty. Although she knew that Plaintiff had scoliosis, that was the first time she learned that Plaintiff claimed to be disabled. At that time, Plaintiff also informed her that she intended to sue their father's estate based on her disability. She claimed that the first time she saw Plaintiff use a cane was the day before this trial started.

Defendant, who saw Plaintiff after Carolyn died in 2019, and after their father's death in 2021, noted that Plaintiff was able to move without difficulty on

14

those occasions. She said that when she saw Plaintiff on November 29, 2021, they stood talking for approximately forty minutes, during which time Plaintiff smoked two cigarettes. While Plaintiff mentioned her scoliosis and her heart issues during their conversation, she did not mention that she was incapacitated by these conditions.

Eileen and Defendant both denied that Plaintiff was treated differently because of her birthmark during their childhood. However, both admitted that their parents made Plaintiff leave home when she was a teenager. While Eileen did not recall why, Defendant claimed that it was due to Plaintiff and their mother fighting, although she blamed the fights on "both of them[.]" She also did not recall seeing marks on Plaintiff's arm following those fights. Eileen admitted that their mother frequently became angry, that she frequently argued with Plaintiff, and that she also argued with her and her other siblings. Eileen said that her mother once threw an iron at her, and she once chased Carolyn around a tree with a broom. Defendant said that she never saw her mother throw anything, and she did not see her chase Carolyn. Defendant admitted that her mother would punish them by making them kneel down, but she denied that they were made to kneel on raw rice. She further denied ever hearing her mother say that she hated Plaintiff. She said that prior to her death, her mother told her that "when Sharon was born she had that birthmark, but she said[,] I loved her unconditionally[,]" and that "it didn't matter about her birthmark." She also denied that her mother ever tried to convince her that Plaintiff was a terrible person.

Eileen admitted that she described her family as dysfunctional, that she left home at eighteen due, in part, to her unhappy home life, and that she had said she was disowned because her mother stopped talking to her when she moved to New

Orleans. She described Plaintiff, during their childhood, as outgoing and happy, and recalled that she was elected class president during her junior or senior year. She believed that Plaintiff was aware of the effect her birthmark had on others based on a comment she made when they were teenagers. However, she could not say to what extent Plaintiff thought about it. She recalled that Plaintiff used special makeup to cover her birthmark when she was older.

Neither Eileen nor Defendant had any knowledge of their parents being diagnosed or treated for depression or anxiety, and Defendant denied that they were afraid to go out in public. Although Eileen knew that her mother took Xanax at some point, she had no personal knowledge that her mother was ever hospitalized due to mental issues. Defendant admitted that her mother experienced short-term depression after her two adult children and her ex-husband died and after the deaths of her four dogs. Whereas Eileen recalled that their mother locked herself in her room after the child she was carrying died during birth, Defendant had no recollection of that event or of any other such event during her childhood. Eileen assumed that their mother was depressed at the time but did not know if she suffered a nervous breakdown. Neither recalled their mother being unable to care for them for any extended periods of time.

Eileen admitted that she struggles with shyness, that she becomes anxious in front of large groups of people, and that she became depressed after Carolyn's sudden death. Although she takes an herbal supplement for stress, she denied that she has ever sought treatment for anxiety or depression. She also denied that her life or ability to function has ever been impacted by anxiety or depression or that her shyness is an inherited condition. Eileen said that she was told by her mother that she refused to eat in restaurants as a child unless someone sat in front of her to

16

prevent the other customers from seeing her. Her mother also told her that her maternal grandmother passed out in a store once after her mother went upstairs without her. Although Eileen did not recall if her aunt refused to shop at a small store near her home, she said, "I'm not a hundred percent positive if she went to that store or not, I was very young. But I do remember something about her husband going shopping."

*Assignment of Error Number One*

Plaintiff argues that the trial court legally erred in relying on her ability to perform the basic activities of daily living (ADLs) as of November 7, 2021, to find that she was not a forced heir under Article 1493(A). Rather, she argues that the "standard is whether the incapacity is such that the person does not have the ability to take care [of] themselves or their estate during times of acute illness or episodes." We disagree.

Dr. Beau Bagley, accepted as an expert in brain injury, spinal cord injury, and physical medicine and rehabilitation, opined that Plaintiff was permanently incapable as of November 7, 2021, because she had been "clearly determined to be disabled" by the SSA and the USDE and because "she had multiple spine disorders that would cause her to have some difficulty in performing some of these more complex [ADLs][.]" His finding was based on the fact that Plaintiff was unable to work, that the effect of her Sturge-Weber syndrome and traumatic brain injury (TBI) would worsen in the future, and that the "objective evidence of spinal issues . . . would make it difficult for her to do anything in a sustained fashion[.]" This, he stated, put her at risk of further injury, and when combined with her anxiety, could cause her to isolate.

17

Dr. Bagley testified that Plaintiff's 2014 and 2016 MRIs revealed that she had severe bilateral foraminal stenosis at C5-6, moderate bilateral foraminal stenosis at C4-5 and C6-7, facet hypertrophy at multiple levels, spinal stenosis, degenerative disc disease in her cervical spine, and herniated discs at C4-3, C5-6, and C6-7. While he also diagnosed her with C7 and C5-6 radiculopathy, his diagnosis was based on an electromyography test (EMG) performed on January 26, 2022. Dr. Bagley did not believe that these spinal disorders were normal for someone Plaintiff's age, and he stated that without surgical intervention, they would be permanent. However, he felt that it would be risky for Plaintiff to undergo surgery based on her comorbidities, especially her cardiac and anxiety issues. He further was not aware of any requirement by the SSA or the American Medical Association that required persons with disabilities to undergo surgery.

While Dr. Bagley did not find that Plaintiff's right carpal tunnel syndrome, history of migraines, SVT, Sturge-Weber syndrome, or TBI rendered her permanently incapable as of November 7, 2021, the combination of these conditions with her spinal disorders created "a perfect storm of events[,]" which affected her ability to care for her person or manage her estate as of that date. He diagnosed Plaintiff with Sturge-Weber syndrome,[6] based on the port-wine stain, gingival hyperplasia, and increased ocular pressure, and with TBI, based on her history of losing consciousness in a car accident when she was seventeen and because she had some numbness in her scalp that was suggestive of TBI.

---

[6] Dr. Bagley described this as a condition that results from a gene mutation that usually occurs in the womb after fertilization of the egg, which causes blood vessel, skin, brain, and eye abnormalities. He admitted that Plaintiff's Sturge-Weber syndrome was not inherited.

18

Dr. Bagley testified that he determines permanent incapacity on a case-by-case basis, first by considering a person's ability to perform the basic ADLs,[7] and second by considering their ability to perform higher-level ADLs.[8] However, he placed greater emphasis on the higher-level ADLs because an inability to perform a higher level ADL, when combined with other issues, can render a person permanently incapable whereas a person who is disabled can perform basic ADLs. As an example, he stated that a person, who is disabled by a spinal cord injury, can "direct their care[]" from their bed but "[t]hey can't feed themselves, they can only tell people how it's done." Dr. Bagley noted that Plaintiff's basic ADLs were only limited by her use of a shower chair to bathe, and her use of handrails on stairs. However, he admitted that he did not question Plaintiff about her ability to perform the higher-level ADLs.

Dr. Chad Domangue, who was admitted as an expert in neurology and pain management, opined that Plaintiff did not have a physical infirmity as of November 7, 2021, which rendered her permanently incapable. He found that her neck and back issues were age-related degenerative findings common in people her age, including a loss of disc height, bone spurs, and arthritis. He also found her mild spinal stenosis at C4-5 and C5-6 and her level of pain common for a "60-plus year old with arthritis." He further opined that Plaintiff's mild spinal stenosis was not abnormal as she was able to walk and was continent. He opined that abnormal spinal stenosis results from moderate to severe spinal stenosis.

---

[7] Dr. Bagley considered basic ADLs to be a person's ability to dress, feed, or bathe themselves, and being continent.

[8] Dr. Bagley described higher-level ADLs as a person's ability to perform such things as cooking, cleaning, driving, and shopping.

While Dr. Domangue admitted that Plaintiff might always have neck pain, he said there were numerous conservative, interventional, and surgical treatments available for her foraminal stenosis, radiculopathy, and carpal tunnel syndrome. However, he noted that Plaintiff has been resistant to physical therapy in the past and that she said she was not interested in either surgery or injections. This statement, Dr. Domangue said, caused him to doubt her veracity regarding her pain. He stated:

> The surgery stuff I understand, surgery is a big risk, but to not be willing to do extensive physical therapy or acupuncture or needle procedures that are five to ten minutes outpatient, but yet be willing to do cataract surgery and so forth, I just struggle with the veracity of the chronic pain, right?

He emphasized that "I've never met that patient in my . . . 20-plus years, I've never met that person before that would not look at me and say 'Doc, I'll do whatever it takes.'"

Dr. Domangue disagreed with the SSA's determination that Plaintiff was disabled as of 2017, as he was unable to differentiate her complaints from "normal age-related arthritic complaints." He said, "I'm not saying she doesn't have pain. . . but where I struggled is deficits to the point that you can't do even simple tasks[.]" He pointed out that Plaintiff "had never had surgery, she was very reluctant to [do] physical therapy, she was taking very little medication, she had never had interventional procedures, had declined them." He found this refusal inconsistent with the fact that she had undergone two cataract surgeries and a root canal. Dr. Domangue pointed to a note in the SSA records as corroboration for his finding: "Although the evidence is not sufficient to support limitations to standing/walking to 4 hours in an 8-hour workday, the clmt would still allow even with a full light RFC, as she is of advanced age and has no PRW. Therefore, I approve the determ as

20

is." He believed that this notation showed that the SSA reviewer did not see "evidence to support somebody having major limitations. But she is older, she does [have] degenerative findings[.]"

Dr. Domangue testified that he also struggled to quantify Plaintiff's physical capabilities as they were solely based on her subjective belief. Moreover, he noted that throughout her medical records, she was found to be independent regarding her ADLs, and he noted that she drove herself to medical appointments, spent time in Texas, drove to his examination, and did not use a cane while he examined her. Thus, he opined that a functional capacity evaluation would be beneficial to assess her physical capacity as well as her balance, mentation, and sensory capacities, all of which are relevant in determining whether a person is permanently incapable. He further stated that a person's incapacity can be accommodated such that he or she is capable of caring for themselves.

Dr. Alicia Pellegrin, an expert in clinical and forensic psychology, performed a forensic mental health evaluation of Plaintiff in 2024. Based on the history related by Plaintiff, she diagnosed her with depression, generalized anxiety disorder, and social anxiety disorder as of November 7, 2021. She admitted that Plaintiff has never been hospitalized and that she has never been rendered permanently incapable due to these conditions in the past.

Dr. Donna Aucoin, an expert in psychology, opined that Plaintiff was not suffering from a debilitating mental incapacity as of November 7, 2021, based on Plaintiff's statement to her "that she was actually doing pretty well from an emotional standpoint with some occasional panic attacks. But after the death, especially when all of the litigation started and her having to relive her history with Dr. Pellegrin that then her emotional status declined."

21

Dr. Aucoin administered the Vineland Three Comprehensive Interview (the test) to Plaintiff because it is used to determine whether a person is able to care for themselves, which comports with the wording of Article 1493. She said that typically, she would not administer the test to someone like Plaintiff, who, in her estimation, was "above average IQ." She explained that the test evaluates a person's ability to function in communication, daily living skills, socialization, and motor skills. Dr. Aucoin testified that while administering the test, she realized that Plaintiff's disability was "more physical in nature because I – I discussed this with Sharon. I said cognitively you're above average, mentally you're very sound, I don't think that you have a debilitating mental illness."

In finding that Plaintiff failed to prove that her mental incapacity or physical infirmities rendered her permanently incapable at the time of her father's death, the trial court stated:

> Under [Article] 1493(A) which states forced heirs are [descendants] of the first degree who, at the time of the death of the decedent are 23 years of age or younger, or [descendants] of the first degree of any age who, because of mental incapacity or physical infirmity are physically incapable of taking care of their persons or administering their estates at the time of the death of the decedent. I find that the Plaintiff has not met her burden of proof in showing that she was permanently incapable of taking care of her person or administering her estate due to mental incapacity or physical infirmity at the time of her father's death. The evidence shows that at the time of her dad's passing, Plaintiff was able to administer her estate; she paid her own bills, she bought her own groceries, she did her own banking, read her own mail, used her own internet or emails, conferred with her own attorneys. Further, the Plaintiff was able to care for her own person in that she dressed herself, bathed herself, fed herself, nurtured friendships and relationships with her children, drove herself to doctors' appointments, ran errands, drove to visit friends and family, sometimes for very long distances, and was even able to help care for others such as her friend, Stan.

Considering our previous discussion regarding the determining factor in finding a descendant a forced heir under Article 1493(A), we find no legal error and

22

no manifest error in the trial court's finding that Plaintiff failed to prove that she was permanently incapable of caring for her person or administering her estate as of November 7, 2021. While Plaintiff relied on Dr. Bagley's opinion to establish that she was physically disabled at the time of her father's death, she presented no evidence that established whether her mental incapacity or physical infirmities rendered her incapable of making reasoned decisions regarding the care of her person or the administration of her estate.

As Plaintiff stated, she had never thought it necessary to grant another person the right to make decisions for her through a power of attorney. Moreover, she was capable of making the decision to institute this litigation and of conferring with her attorneys regarding the litigation. According to Plaintiff's own testimony, she was also capable of making her own medical appointments, of deciding whether a question from her medical provider was an invasion of her privacy or legitimately related to her medical issues, and of deciding whether a recommended medical treatment would be beneficial to her. In addition to the tasks mentioned by the trial court in its reasons, the evidence established that Plaintiff was managing her affairs at the time of her father's death. She was paying her own bills, which required her to manage her own money, and was shopping for herself whether personally or by electronic means online.

Further, Dr. Pellegrin unequivocally testified that Plaintiff's past disability was physical in nature and that she was not rendered incapable as of November 7, 2021, due to her mental incapacity. This finding was bolstered by Dr. Aucoin's testimony that Plaintiff was not suffering from a debilitating mental incapacity at the time of her father's death.

23

Thus, we find no manifest error in the trial court's finding that Plaintiff failed to prove that she was a forced heir under Article 1493(A) as neither her mental incapacity nor her physical infirmities rendered her permanently incapable at the time of her father's death.

*Assignment of Error Number Two*

In her second assignment of error, Plaintiff argues that the trial court legally erred by failing to find that as of November 7, 2021, she was a forced heir pursuant to La.Civ.Code art. 1493(E). She asserts that Dr. Pellegrin's forensic evaluation established that she was suffering from depression and anxiety, which are inherited and incurable conditions that might render her physically incapable in the future. Plaintiff also argues that the trial court legally erred in its interpretation of La.Civ.Code art. 1493(E) because the "[j]urisprudence establishes that Article 1493(E) does not require proof identifying a particular family member having the disease or condition whom it was inherited from but rather the standard is that the disease or condition is inheritable[.]" We disagree.

Dr. Pellegrin diagnosed Plaintiff with depression, generalized anxiety disorder, and social anxiety disorder at the time of her father's death.[9] She admitted that while there was no medical documentation verifying these conditions as of November 7, 2021, her diagnoses were based solely on the history provided by Plaintiff. She related Plaintiff's depression and generalized anxiety disorder to her childhood rejection by her mother, her perceived "differential negative treatment from her mother[,]" and the verbal and physical abuse she received and feared she

---

[9] Dr. Pellegrin also diagnosed Plaintiff with post-traumatic stress disorder. However, as this is not an inherited condition, she did not factor that diagnosis into her opinion regarding the elements of Article 1493(E).

24

would receive at the hands of her mother. She related Plaintiff's social anxiety disorder to her port-wine stain and the adverse reactions she has received to it from the public.

Dr. Pellegrin testified that depression and anxiety can either be inherited or can result from environmental factors. She opined that Plaintiff's conditions were inherited based on her family history, as related by Plaintiff, that her mother suffered nervous breakdowns; that Eileen failed to attend her daughter's wedding shower and cried before work meetings due to anxiety; that her aunts or other family members would not leave their homes; and the severity of her own symptoms. However, she admitted that she was unable to verify this history.

Although Dr. Pellegrin did not specifically say that depression is incurable, she said that generalized anxiety and social anxiety disorders are curable. However, in Plaintiff's case, she did not think they were curable because her depression was intractable and because she did not believe that Plaintiff would undergo therapy due to her inability to trust therapists. She also believed that Plaintiff would have difficulty overcoming her social anxiety disorder as her port-wine stain is permanent.

Dr. Pellegrin thought it was "entirely possible" that Plaintiff's depression and anxiety would render her incapable in the future. She admitted that Plaintiff was not currently receiving treatment for these conditions and that she was able to care for herself on a day-to-day basis as she was able to feed herself, dress herself, pay her bills, and attend medical appointments. She also predicted that based on Plaintiff's past behavior, she would be capable of functioning in the future.

Dr. Pellegrin opined that a person's ability to care for their person or their estate involves some social interaction. However, she could not quantify the amount of social interaction required and admitted that it was not necessary that the social

25

interaction occur outside of the home. Dr. Pellegrin agreed that if Plaintiff has five close friends, she is consistent with the average person, who has three to five close friends. She also stated that Plaintiff reported having little social interaction with her friends, which was mainly via telephone.

Dr. Bagley testified that while he did not believe that Plaintiff's Sturge-Weber syndrome and her TBI rendered her incapable as of January 7, 2021, he opined that they could cause her mental capacity to worsen in the future.

Dr. Aucoin testified that she did not think that Plaintiff's depression and anxiety would render her incapable in the future. She stated, "she's thus far done very well in managing it. And probably has developed even more coping skills over the years than she had as a younger child and a young adult."

Dr. Aucoin testified that depression and anxiety can either be inherited or can result from environmental factors.[10] She said that depression that is non-hereditary can result from a specific stressor, such as a divorce or the death of a loved one. Generalized anxiety disorder "can show up in an array of settings or situations. And it's sometimes unpredictable." She stated that a person can suffer debilitating anxiety from a fear of flying or of crossing a bridge. She described social anxiety disorder as anxiety that is specifically related to socializing with others, usually people not known by the person. However, she opined that a fear of public speaking or of large groups does not qualify as an anxiety disorder unless it impacts a person's occupational function or ability to socialize. Although Dr. Aucoin agreed that social anxiety can cause a person to completely isolate, she thought that such a person could function without leaving their home. She stated, "With the advent of modern

---

[10] Regarding Plaintiff's diagnosis of PTSD by Dr. Pellegrin, Dr. Aucoin testified that PTSD is not inherited and is curable through therapy and medication.

26

technology and some of the new resources that have become available after COVID many people are able to live more fulfilling lives staying home."

Dr. Aucoin's opinion that Plaintiff's birthmark was the source of her depression, anxiety, and her social isolation was based on her report that her father rejected her from birth, and the fact that she was teased and humiliated in public places because of her birthmark. Regarding whether Plaintiff's family had a history of anxiety and depression, Dr. Aucoin replied, "I don't know. There was one that was reported, yeah." She further testified that Plaintiff's birthmark could be an environmental factor causing her anxiety. Although she opined that Plaintiff's anxiety differs somewhat from that suffered by other people, it could be treated in a similar fashion. She further stated that on average, people in the United States have three to five close friends, and Plaintiff would be average if she had that many close friends.

Dr. Aucoin testified that depression is treatable with therapy and psychotropic medication, and that for most people, the condition is curable in that their symptoms are in remission and no longer affect their quality of life. There are even adjunct treatments for treatment-resistant depression, such as ketamine infusions, combinations of medication, and shock therapy. She stated that anxiety can be treated with cognitive behavioral therapy and different types of medication, and like depression, these treatments can cause a regression of the symptoms such that they no longer affect the patient's quality of life.

Dr. Aucoin testified that Plaintiff has never undergone inpatient or outpatient mental treatment. She said that Plaintiff was prescribed Xanax by her nurse practitioner after she complained of panic attacks, and the nurse practitioner later referred her to a psychiatrist, who she sees twice a year. Dr. Aucoin opined that

27

Plaintiff would benefit from seeing a therapist, that there is never a time when seeing a therapist would not be helpful, and that Plaintiff's knowledge regarding therapy would not render it unhelpful for her. She stated that despite having three master's degrees and a PhD in psychology, she, herself, sees a therapist.

Dr. Domangue testified that he found no evidence that Plaintiff was suffering from a medically documented inherited, incurable neck or back issue as of November 7, 2021, which might render her permanently incapable in the future. He opined that Plaintiff did not suffer from Type 1 Sturge-Weber syndrome because her medical records contained no evidence she suffered from brain abnormalities or glaucoma. Thus, he felt it unlikely that she would be rendered permanently incapable in the future due to the brain abnormalities associated with Type 1 Sturge-Weber syndrome.

In finding that Plaintiff failed to prove that she was a forced heir pursuant to Article 1493(E), the trial court held:

> As to [Article] 1493(E) which reads that for purposes of this article, permanently incapable of taking care of their persons or administering their estates at the time of the death of the decedent shall include descendants who, at the time of the death of the decedent, had, according to medical documentation, an inherited, incurable disease or condition that may render them incapable of caring for their persons or administering their estates in the future. I do not find that the Plaintiff has met her burden of proof here either. There was no evidence presented to show that Plaintiff had medical documentation of an inherited, incurable disease or condition that may render her incapable of caring for her person or administering her estate in the future.
>
> Although, all experts testified that some of the ailments or conditions Plaintiff suffers from such as depression and anxiety can be inherited, there is insufficient proof other than Plaintiff's own testimony that her parents or relatives suffered from these conditions. In fact, the testimony of both sisters contradicted her testimony, other than to state that their mother did suffer from situational depression as a result of losing children or beloved pets.

28

As to the conditions being incurable, this is unknown because Plaintiff has refused to attempt treatment recommendations such as mental health therapy, physical therapy, surgery, injections, implants, yoga, palates [sic], acupuncture, or other viable treatment alternatives; the only treatment she has been open to receiving is pharmaceutical. Further, Plaintiff admits that she is not honest with medical providers who ask questions that she believes are irrelevant to her ailment. Because of that, her veracity regarding her ailments in [sic] brought into question. All experts testified that her ailments are treatable and sometimes curable or put into remission with the proper treatment. Even Plaintiff's own experts testified the potential treatments were available but not effective for the Plaintiff only because she is not willing to do them. The expert testimony stated that the best predictor of the future is the past, and there is nothing in her past to indicate that she will not be able to care for her person or administer her estate in the future.

Louisiana Civil Code Article 1493(E) provides that "permanently incapable" for the purposes of forced heirship, includes "descendants who, at the time of death of the decedent, have, according to medical documentation, an inherited, incurable disease or condition that may render them incapable of caring for their persons or administering their estates in the future."[11] Our research has found only a handful of cases that consider, and only one case that was decided, under Section (E) since Article 1493 was amended in 2003. As noted by Professor Wallace:

> The addition of section E to Article 1493 expanded the definition of forced heirs to include not only descendants who are incapable at the time of the decedent's death, but also descendants who "may" be incapable in the future. The expansion, however, is limited by the requirement that, *at the time of the decedent's death*, the purported heir must have an inherited and incurable disease or condition that can be proven by medical documentation and that could render the heir incapable in the future.
>
> Presumably, the intended purpose of the expansion was to ensure that descendants at-risk of incapacity due to inherited incurable medical conditions are protected, even if they are not presently incapable.

---

[11] Louisiana Constitution Article 12, § 5 (emphasis added) provides that the second class of forced heirs includes "descendants of any age who, because of mental incapacity or physical infirmity, **are** incapable of taking care of their persons or administering their estates." While there may be a question regarding the constitutionality of Article 1493(E) (emphasis added) based on the use of "**may**[,]" that issue was not raised in the trial court.

Unfortunately, no Revision Comments concerning the addition of section E were included, despite a request by the legislature to the Louisiana State Law Institute "to write comments to all changes" made by Act 1207 of 2003. With no specification of legislative intent concerning its language, the intended purpose and scope of section E are unclear, which has created uncertainty as to whom it should apply.

Courts tend to focus appears [sic] on the condition's permanency and incurability, and by law, the condition must be inherited.

10 MONICA HOF WALLACE, LOUISIANA CIVIL LAW TREATISE: SUCCESSIONS & DONATIONS § 10:3 (3d ed. 2021) (footnotes omitted).

Moreover, none of the cases actually considered how the term "inherited" was meant to be interpreted by the legislature. Unlike the matter at issue, the trial court in each case found that the plaintiff's bipolar disorder was inherited based on uncontroverted expert testimony that it was inherited. *See Succession of Ardoin*, 07-43 (La.App. 3 Cir. 5/30/07), 957 So.2d 937, *writ denied*, 07-1332 (La. 9/28/07), 964 So.2d 360; *Stewart v. Estate of Stewart*, 07-333 (La.App. 3 Cir. 10/3/07), 966 So.2d 1241; and *Succession of Forman*, 37 So.3d 1081. However, the question of whether the term "inherited" means "inheritable" as argued by Plaintiff was considered by Professor Trahan in his *Recent Developments in the Law, 2002–2003, Successions & Donations*, 64 La. L. Rev. 315 (2004). After noting that "[t]he term 'inherited' means 'genetically transmitted from one generation to the next[,]" he stated:

"But," the critics of the new legislation retort, "it is unclear whether the determination of 'inheritedness' is to be made generically or individually." As the critics correctly note, some diseases, though they are normally contracted by genetic transmission, can in certain unusual cases have some non-genetic cause, for example, infection or injury. Such a disease, the critics contend might well be considered "inherited" not in the sense of "always and only inherited" but rather in the sense of "usually inherited." And so, the critics ask, "What is one to say of a person who suffers from a disease that, though normally contracted genetically, he did not in fact inherit, that is, that he contracted through some other cause? Does he have an 'inherited disease'?"

This objection fails. Had the legislators intended that the determination of "inheritedness" be made on the basis of the characteristics typical of the disease, without regard to whether, in any given case, the disease of the particular purported forced heir had, in fact, been inherited, then they would have used the term "inheritable"—meaning that which can be, but need not necessarily be, inherited—not the term "inherited."

*Id.* at 367–68 (footnote omitted).

While Plaintiff claimed that her depression and anxiety were inherited, her own expert, Dr. Ardoin, was unable to verify any of the family history relied on by Plaintiff for this issue. Furthermore, the trial court was presented with conflicting views of the evidence through the testimony of Plaintiff's sisters denying a family history of depression and anxiety. Also, the October 11, 2023 medical record from Plaintiff's psychiatrist indicates that she denied a family history of psychiatric issues or that she experienced excessive anxiety while growing up.

Considering the meaning of "inherited" as expressed above, we find no legal error in the trial court's interpretation of Article 1493(E). Moreover, "[w]here the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous." *Snider v. La. Med. Mut. Ins. Co.*, 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323. In addition, the trial court expressed reservations as to Plaintiff's credibility after she admitted that she would answer untruthfully to any question from her healthcare providers that she thought was irrelevant. These included questions regarding whether she was feeling depressed or anxious. "Because of the trial court's ability to observe the tone, temperament, and nonverbals of witnesses to determine credibility, a finding related to a witness's credibility demands 'great deference.'" *Ignont v. Breen*, 25-1230, p. 1 (La. 12/16/25), 424 So.3d 673 (per curium) (quoting *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989)). Finally, we note that neither

Plaintiff's Sturge-Weber syndrome nor her TBI were inherited conditions. As noted under the discussion regarding Article 1493(A), Dr. Bagley admitted that Plaintiff's Sturge-Weber syndrome was not inherited, and the evidence established that Plaintiff's TBI resulted from a car accident.

Accordingly, we affirm the trial court's finding that Plaintiff failed to prove that her physical or mental conditions were inherited. Moreover, as this finding precludes her from proving that she is a forced heir pursuant to Article 1493(E), we pretermit any further consideration of whether her mental conditions were documented or incurable.

## DECREE

For the foregoing reasons, the judgment of the trial court in favor of Angela Clare Goudeau, as independent executor of the Succession of James Vernon Goudeau, finding that Sharon Schmidt failed to prove that she was a forced heir under either La.Civ.Code art. 1493(A) or (E), is affirmed. The costs of this appeal are assessed against Sharon Schmidt.

**AFFIRMED.**

32